UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

PLAQUEMINES HOLDINGS, L.L.C.                     CIVIL ACTION

VERSUS                                           NO. 11-3149

CHS, INC.                                        SECTION "C" (4)

<u>OPINION</u>

This matter was tried before the Court, without a jury, on April 15, 2013 and  April 16,

2013, and taken under advisement.  Rec. Doc. 103.[1]  The Court conducted a site visit on April

18, 2013. Rec. Doc. 104.  Having considered the evidence and the testimony adduced at trial, the

record, and the post-trial memoranda of counsel, and the law, the Court now issues its opinion in

favor of the plaintiff, Plaquemines Holdings, LLC ("PH"), and against the defendant, CHS, Inc.

("CHS"), for the following reasons.

**I. BACKGROUND**

This case involves a dispute over a Servitude Agreement ("SA").  PH seeks a declaration

of rights under the SA to construct a dock on the Mississippi River. Rec. Doc. 1 at 4.

Additionally, PH seeks to stop CHS' construction of a large holding or retaining pond ("retaining

pond") which will allegedly prohibit PH's use of its servitudes. *Id.*  CHS' immovable property,

which is burdened by the servitudes in favor of PH, is in Myrtle Grove. *Id.* at 5.  At the property,

---

[1]The transcript of each day's proceedings shall be differentiated by day I and II in future
citations to the date and page from each day of trial.

1

CHS operates a grain elevator known as the Mississippi River Grain Elevator ("grain elevator"). *Id.* CHS' property, in addition to the grain elevator, has a storage facility, a dock on the Mississippi River, and appurtenant facilities including a barge cover station. *Id.*; Rec. Doc. 10 at 2; Rec. Doc. 66 at 3.

CHS is the successor-in-title to ConAgra. Rec. Doc. 66 at 4. ConAgra granted a Predial and Personal Servitude (under the SA) to the Mississippi River Alcohol Company, Inc. ("MISSALCO"), PH's predecessor-in-title, on August 30, 1994. Rec. Doc. 1 at 5. An instrument recorded the SA in Plaquemines Parish in COB 860, Folio 681, on May 23, 1995. *Id.* The SA includes a "belt" servitude and a "dock and delivery system" servitude. *Id.*[2]

MISSALCO was the predecessor-in-title to Archer-Daniels-Midland Company ("ADMC"), and PH is now the successor-in-title to ADMC. *Id.* at 6. In 2005, CHS and ADMC executed an instrument, which was recorded in Plaquemines Parish, at C.O.B. 1095, Page 138. *Id.* It was entitled "Mutual Estoppel Certificates and Acts of Ratification" and declared the servitude at issue here to be "still in full force and effect and [to] not [have] lapsed by virtue of non-use, [or] passage of time . . . ." *Id.*

PH (the dominant-estate-holder) wishes to construct and operate a barge dock in the servitude area and to have access to the barge dock. Rec. Doc. 66 at 4. PH has leased the facility to Omega for operation of a waste oil reconditioning facility, and Omega requires a dock to use

---

[2]A separate agreement that gives CHS rights to use PH utilities and access road and rails over the PH property is trial exhibit 14.

in conjunction with the plant. *Id.* at 3. PH alleges that CHS has begun construction of a retaining pond on its property in an area burdened by one of the servitudes, and that the pond will adversely impact PH's servitude rights by restricting its delivery system. *Id.* at 5-6. CHS claims that PH's barge dock will "unreasonably interfere" with CHS' grain elevator operations in violation of Section 3.2 of the SA, and therefore PH may not construct a barge dock within the servitude area. *Id.* at 6. PH's barge dock allegedly interferes with CHS' operations because it blocks access to CHS' barge cover station. *Id.* CHS constructed the barge cover station approximately seven years after the SA was confected. *Id.*

PH submitted an application for a permit to build the dock to the U.S. Army Corps of Engineers ("the Corps") on April 9, 2012. *Id.* at 15. CHS submitted a written objection to PH's proposal on August 7, 2012. *Id.* at 19. Since submitting the proposal, PH has developed two other design drawings of proposed locations for other docks within the servitude area. *Id.* at 7.

CHS claims that because PH never requested consent to use the plant for motor oil, the SA does not give PH rights to construct the dock because the SA provides only for PH to produce a grain-based product. *Id.* at 13. Furthermore, CHS contends that the SA does not permit PH to authorize an invitee, such as Omega, to enter CHS' property to operate the facility because the SA only allows a lessee to enter CHS' property as reasonably necessary for PH to exercise its servitude rights. *Id.* at 12.

PH filed a petition for injunction, declaratory judgment and damages in the 25th Judicial District Court for the Parish of Plaquemines on December 13, 2011. Rec. Doc. 1. CHS properly

3

removed the case to this Court under 28 U.S.C. § 1441(a) on December 27, 2011. *Id.* This Court

has jurisdiction pursuant to 28 U.S.C. § 1332. Rec. Doc. 7 at 2. PH seeks a declaratory

judgment, pursuant to the SA, granting it the right to "construct, operate, use, maintain, repair,

and (if needed in the future) replace a dock and any and all other appurtenant and related

structures (the river and land side of the Mississippi River levee) in the servitude area in line

with the existing dock facility operated by CHS, Inc. according to the surveys attached to the

original Servitude Agreement." Rec. Doc. 1 at 7. The Court has exercised its discretion to hear

this declaratory judgment action. Rec. Doc. 7 at 8. PH also seeks an "injunction requiring the

return of the Servitude property to the same physical state that it was in <u>before</u> any construction

activity began." *Id.*

## II. THE SERVITUDE AGREEMENT

The Court heard testimony from eleven witnesses including (1) Janet Cagley (the

financial executive for Henderson Auction JAH Enterprises, Inc.) for PH, (2) James Cook

(former general manager of CHS' grain elevator) called by PH on cross examination, (3) Chad

Poche (civil engineer and vice president of Gulf South Engineering and Testing, Inc.) for PH, (4)

William Hurst (Mr. Stewart's previous business partner) for PH, (5) Kenneth Stewart (a partner

in PH), (6) Gary Anderson (CHS' company representative), (7) Timothy Paurus (Vice President

of Terminal Operations for the grain marketing business unit at CHS) called by PH, (8) Steven

Talbot (general manger of CHS' Myrtle Grove Terminal) for CHS, (9) Wayne Wilson (certified

as an expert river pilot) for CHS, (10) Kenneth Nelson (a certified expert in professional

4

engineering) for CHS, and (11) J. Stephen Lucas (an expert in grain trading operations and elevator supply chain management) for CHS.

A. CHS' Claims for Invalidity of the SA

As a preliminary matter, the Court addresses CHS' claims at trial and in its post-trial brief that PH may not construct a dock for use by a lessee, Omega, or for use with a facility that is reconditioning motor oil. Rec. Doc. 116 at 12.  CHS argues that the SA expressly forbids the use of the servitude by Omega. *Id.*  Section 15.1 of the SA states: "PH shall not authorize any invitee or other person to enter the Company Property except as reasonably necessary for [PH] to exercise its servitude rights for its legitimate needs in operating the Plant." Trial Exh. 1.  An invitee is defined as including "any lessee or sublessee of any portion of [PH] Property or the buildings thereon . . . ." *Id.* § 1.  Section 15.1 also recites that the grant of servitude rights to PH "shall also include the use of such servitude rights by Invitees of [PH]."  Omega, as PH's lessee, is PH's invitee. Tr. I:244 (testimony of Stewart). While the Section caveats the use of PH's rights by an invitee with the fact that invitees are only allowed to use the servitude rights "to the extent reasonable and necessary to perform the services for [PH] for which they were authorized to enter the Company Property," this statement appears to indicate only that invitees may not freely trespass on CHS' property. Trial Exh. 1, § 15.1.  It does not expressly forbid the use of the servitude rights by the invitee.  It actually does the opposite.  The Section acknowledges that invitees may use the servitude rights. *Id.*

CHS also makes the claim that even if PH may construct the dock for its invitee, Omega,

it may not construct the dock because Omega's proposed operation violates the SA by processing used motor oil. Rec. Doc. 116 at 13.  CHS relies heavily on the idea that the SA was formed to further the relationship between CHS and PH's predecessors.   Cook, the general manager of CHS' grain elevator, testified credibly about this relationship. Tr. I:83.  CHS argued that the parties to the SA: "envisioned the production of grain-based ethanol on the dominant estate through the purchase and use of the grain that was already passing through servient estate's grain distribution operation." Rec. Doc. 116 at13.  Despite what the original signatories may have envisioned, there is no "synergy" between CHS and PH's operations.  Nor has there been over the last nearly twenty years while the SA has been in force.  The parties have not shown that they are considering working together on the production of any product by relying on the other's product for raw material.  To forbid PH from using the servitude for the production or transport of another product, when there is no foreseeable agreement with CHS to use its grain for grain-based ethanol, would unreasonably restrict the use *of PH's* immovable property.  Louisiana law favors the free use of immovable property. *Leonard v. Lavigne*, 245 La. 1004, 162 So.2d 341, 343 (La. 1964)*; Textron Financial Corp. v. Retif Oil & Fuel LLC*, 342 Fed. App'x 29, 34 (5th Cir. 2009) (citing *Leonard*, 245 La. 1004 at 343).

The SA allows PH to produce alternative products including refined motor oil.  The SA itself defines the product which may be produced by PH to be "all ethanol produced by the ethanol production facility on the [PH] property, *as well as all other products manufactured, distilled, refined or otherwise produced through operation of the Business on the [PH]*

*Property*" (emphasis added). Trial Exh. 1, § 1.  However, the SA includes in the definition of the term "Business" that PH's business may include that of "other processed chemicals," but approval is required. *Id.*  Building on this, buried in the definition of "Business" is the requirement that PH may not use the servitude to undertake unrelated business activities, not related to grain processing, "without the prior written consent of Company, which consent shall not be withheld unless such unrelated use unreasonably interferes with Company's business activities and operations of the Elevator." *Id.*  To determine whether Omega may, with written consent of the company, work with motor oil, the Court looks at whether use of that product would unreasonably interfere with CHS' business activities.

Omega's use of the servitude to ship refined motor oil does not unreasonably interfere with CHS' business.  CHS' only argument for why Omega's use of the dock unreasonably interferes with its business appears to be a red herring. Rec. Doc. 115 at 20.  The argument is that Omega's use of the dock to ship refined motor oil interferes with CHS' business because it is unsafe to ship motor oil near grain. Rec. Doc. 116 at 15.[3]  Cook made clear to the Court in his testimony that CHS' issue is with the position of the dock, and the extent that any dock impacts barge access to the barge cover station, not whether there is motor oil versus ethanol going through the pipeline to whichever dock is built. Tr. I:96-97.  Cook stated that ethanol is

_____

[3]At trial, even CHS' representative, Anderson, took no position on whether motor oil was more hazardous than ethanol, deferring to the SA. Tr. I: 252.

7

extremely explosive, just as grain dust is. Tr. I: 97.[4]

CHS insinuates in its post-trial brief that a safety concern results from Omega

transporting motor oil rather than ethanol from the dock. Rec. Doc. 116 at 13.  The SA requires

CHS to give written consent to the use of any "hazardous substance." Trial Exh. 1, § 15.4.  Out

of an abundance of caution, CHS must provide written consent that Omega may use PH's dock

for motor oil.  The Court finds that CHS may not withhold its consent to use of the dock or

facility for motor oil because, in consideration of the original agreement to use the servitude for

a substance as potentially hazardous as ethanol, withholding of consent to use the servitude for

motor oil would be unreasonable.

## B. Placement of the Dock under the Servitude Agreement

As CHS has argued, a predial servitude is in derogation of public policy, and therefore

must never be sustained by implication. *Palomeque v. Prudhomme*, 95-0725 (La. 11/27/95), 664

So.2d 88, 93 (La. 1995).  Any "[d]oubt as to the existence, extent, or manner of exercise of a

predial servitude shall be resolved in favor of the servient estate." La. Civ. Code art. 730.  Here,

there is no doubt. *See* Rec. Doc. 66 at 17 (stating as uncontested material fact that CHS'

predecessor-in-title granted a servitude in favor of PH's predecessor on August 30, 1994, which

burdened CHS' immovable property "on the 'land' side of the Mississippi River levee as well as

---

[4]Stewart stated on cross-examination that motor oil had a lower flash point than ethanol. Tr. I:190.  Stewart is not an expert in this area, and the Court declines to take judicial notice of the flash point of either substance because no evidence has been supplied to it based on the chemical compounds at issue here, and the flash point of motor oil may be manipulated.

extending out into the Mississippi River in line with a dock" and that the servitude is currently in effect between the parties).

Since a written agreement or contract governing the servitudes at issue in this case exists, the servitudes are regulated by the agreement, and the Court looks to the SA for guidance. La. Civ. Code art. 1983 (contracts have the effect of law for the parties and must be performed in good faith); *Terrebonne Parish School Board v. Columbia Gulf Transmission Co.*, 290 F.3d 303, 315 (5th Cir. 2002) (finding that the Louisiana suppletive law of property applies if the parties do not specify the use and extent of the servitude); *St. Martin v. Mobil Exploration & Producing U.S. Inc.*, 224 F.3d 402, 409 (5th Cir. 2000) (citing *Ogden v. Bankston*, 398 So.2d 1037, 1040 (La. 1981)) (explaining that when a servitude is created by contract, the mode of use of the servitude is regulated by that contract). The Court reads the SA for the plain meaning of its terms under Louisiana Law. *St. Martin*, 224 F.3d at 409 (citing *Massie v. Inexco Oil Co.*, 798 F.2d 777, 779 (5th Cir. 1986)). The SA covers the main issue here, which is whether PH can construct a barge dock in the servitude area, and the manner of exercise of PH's right to this.

The SA grants PH the right to "construct, operate, use, maintain, repair, and replace the [PH] dock." Trial Exh. 1, § 3.1. The SA stipulates that the dock "may only be located within the area indicated as the Grantee Dock Servitude Area on the Servitude Survey, in line with the existing Company dock, in such a specific location as shall not unreasonably interfere with barge and ship traffic for the Elevator." Trial Exh. 1, § 3.2; *See* Trial Exh. 2 for servitude area.

CHS argues that if PH places one of its proposed barge docks in the servitude area, it will

unreasonably interfere with barge traffic to the Elevator, and therefore "Plaquemines Holdings

may not construct its barge dock anywhere within the Servitude area." Rec. Doc. 66 at 6.

However, CHS specifically states in its post-trial memorandum that it does not take the position

that any dock placement is impossible, only that PH's currently proposed dock violates the SA.

Rec. Doc. 116 at 3.

### 1. Breach of the Servitude Agreement

CHS' construction of its barge cover station did not breach the SA.  The SA permits CHS

to develop its property, "so long as such development does not physically damage any Servitude

Works owned by [PH] or its invitees, and does not unreasonably limit or otherwise adversely

affect any existing or future exercise of rights under the Servitudes, or the use, maintenance,

repair, replacement or operation of the Servitude Works facilitating the use of the Servitudes."

Trial Exh. 1, § 9.  At the time CHS constructed the barge cover station in 1998, there was no

dock in the servitude area.[5] Rec. Doc. 78 at 6.  But, the SA specifically states in plain language

that CHS' development, including "present and *future* improvements" (emphasis added) may not

adversely affect any "existing or *future* exercise of rights under the Servitudes" (emphasis

added). *Id.*  Section 9 of the SA references the future twice to specify that it applies to both

---

[5]Uncertainty has been presented as to whether the barge cover station was constructed in 1998 or 2000, but the difference is immaterial. *Compare* defendant CHS' Post-Trial Memorandum in Rec. Doc. 116 at 4 (referring to the barge cover station as constructed in the year 2000), *with* CHS' Proposed Findings of Fact and Conclusions of Law in Rec. Doc. 78 (referring to the barge cover station as built in 1998).

improvements in the future and PH's servitude rights in the future.  The barge cover station was a future improvement at the time the SA was granted.[6]  While the Court finds that CHS did not breach the SA by constructing the barge cover station, the barge cover station may not unreasonably limit or adversely affect the future exercise of PH's rights under the servitude in the form of PH's desire to build a barge dock.

The 2005 Mutual Estoppel Certificates and Acts of Ratification ("the Certificate") did not acknowledge that there had been no breaches to the SA or waive any claim with regard to the barge cover station as CHS has argued. Rec. Doc. 116 at 20.  A plain reading of the document provides that PH's predecessor-in-title, ADMC, never stipulated that CHS could not be in default. Trial Exh. 37.  Rather, the parties declared that CHS was not currently in default and declared that there was no pending litigation that would affect the enforceability of the servitude. *Id.* at 2.  Hurst stated at trial that he had the easements recertified as part of his due diligence before PH purchased the facility. Tr. I:155.  The Court finds to be credible Hurst's testimony that the reason the Certificate was prepared was to assess the rights that would accompany the

---

[6]Section 10.7 of the SA further confirmed that CHS had the right to construct or install "buildings, storage facilities or other improvements or equipment" in areas burdened by the servitudes. However, it also stipulates that CHS may do this "<u>provided</u> that doing so does not prevent reasonably convenient access to, and construction, installation, use, operation, maintenance, repair and replacement of, Servitude Works by [PH] to the extent provided in this agreement" (emphasis supplied).  Despite CHS' attempt to use this Section to argue that a barge cover station outside the servitude area does not infringe on PH's rights, the Section is not relevant because it does not say anything about improvements outside of the servitudes area, and the barge cover station is an improvement outside of the servitude area. Rec. Doc. 116 at 19.

acquisition of the PH property, and finds that the purpose of the Certificate was to make clear that the SA was still in effect. Tr. I:166.  The Certificate states that the SA "is still in full force and effect and has not lapsed by virtue of non-use, [or] passage of time . . . ." Trial Exh. 37 at 2. The Certificate did not waive the parties' right to dispute any breaches that occurred as a result of development undertaken between the time the servitudes were granted in 1994 and the time the Certificate was executed in 2005.  The Certificate made no mention of development or improvements between that period, or anything that would change the SA from how it was drafted in 1994.

### 2. Selection of a Dock

The servitude area is located 409 feet from CHS' barge cover station. Tr. I:117-18 (testimony of Poche).  PH proposed one dock when it applied for a permit from the Corps. *See* Trial Exh. 5 for the permit application.  That permit was rejected. Tr. I:101 (testimony of Poche). PH has now proposed two other docks. Trial Exh. 4. The placement of the dock under Option 1 is of questionable feasibility because it would require dredging or removing some of the bank, which would require the permission of the Corps. Trial Exhs. 4-A, 4-B; Tr. I:115-16 (testimony of Poche).  It would also require breaking up the concrete in the revetment. Tr. I:135 (testimony of Poche).  Option 2 is the dock that appears in trial exhibits 4-C and 4-D.  Poche explained at trial that with this design, CHS would  be able to fit a barge into the first slot, but would not be able to access the second bay or second lane of the port side of its facility when PH had a barge

at its dock. Tr. I:114-15.[7]  CHS will be able to access both bays or lanes of the barge cover

station when PH has no barge at its dock. Tr. II: 105-06 (testimony of Wilson).

      PH has not asked CHS to approve PH's design drawings of the docks. Tr. I:125

(testimony of Poche).  After the SA grants PH the right to construct and operate a dock, the SA

sets out certain requirements for the location.  In addition to the requirements of being located

within the servitude area, being in line with the existing dock, and not unreasonably interfering

with traffic to the elevator, the SA requires that the dock not occupy any more of the servitude

area than is reasonably necessary to accommodate an appropriately sized dock, and that the

requirements are "as approved pursuant to Section 10.3, below." Trial Exh. 1, § 3.2.  Section

10.3 provides that PH not undertake any construction or materially different or new usage of

CHS property without its "plans and specifications in reasonable detail hav[ing] been submitted

to and approved by Company, which approval shall not be unreasonably withheld or delayed. . .

."  The Court finds that in accordance with this provision, PH must submit its plans to CHS for

approval.  However, because CHS may not unreasonably withhold approval, the Court orders

CHS to approve PH's plans as long as they are in accordance with what is stipulated in this Order

and Reasons.

      The Court finds that PH has a right to build a barge dock in the servitude area.  While PH

---

     [7]Before building the barge cover station, CHS operated with one lane of barges and put the hatch covers back on each barge upriver with a different crane and crew than took it off. Tr. I: 267 (testimony of Paurus).  CHS could similarly now bring a barge that had been unloaded back around to the first lane to put the hatch covers back on. *Id.*

has the right to build the dock, PH must build a dock that is in line with the existing CHS dock and will be the least invasive to CHS' operations including, if possible, the barge cover station. PH must modify either Option 1 or Option 2 to ensure that the outer, river-side (or outboard as opposed to land-facing) edge of the proposed dock follows the same line as the outer, river-side edge of the existing CHS dock. Because PH must build the dock that is least invasive to CHS' operations, if the Corps will permit PH to build the dock in Option 1, it must do so.[8] If the Corps shall not permit PH to build the dock in Option 1, PH may build the dock in Option 2.[9] If both designs are rejected by the Corps, CHS shall work with PH to find a design that meets the needs of the Corps. Any design must be for a dock that has an outer, river-side edge that matches up with the existing CHS dock in distance from the bank. Additionally, CHS shall not oppose PH's permit application.[10] If there is no dock that can obtain a permit while the barge cover station

---

[8]The Court notes that the dock designs proposed in trial exhibit 4 are not engineering drawings. Tr. I: 125 (testimony of Poche).

[9]The Court reminds the parties that this opinion and the subsequent judgment do not alleviate the need for a permit from the Army Corps of Engineers.

[10]CHS argues that because the SA is a personal or predial servitude, not a contract for personal obligations, Louisiana Civil Code Articles 651 and 640 ensure that CHS cannot be compelled by PH to take any action and therefore CHS cannot be forced to assist PH in the permitting process. Rec. Doc. 116 at 24-25. This argument is not relevant because the Court is mandating CHS not oppose the permit rather than that CHS actively assist in getting the permit. Furthermore, CHS agreed in Section 10.2 of the SA to "use reasonable efforts to assist [PH], at [PH's] expense, to obtain any necessary licenses, permits or other approvals from any governmental Authority. . . ." CHS must not obstruct PH's permitting process and must cooperate with PH in obtaining the permit.

remains in place, CHS must remove the barge cover station because it was not present when the SA was granted.  If CHS wishes, it may propose another area where PH may build its dock as long as that area is accessible from PH's facility.

The Louisiana Civil Code provides that if the original location of a servitude "has become more burdensome for the owner of the servient estate, or if it prevents him from making useful improvements on his estate, he may provide another equally convenient location for the exercise of the servitude which the owner of the dominant estate is bound to accept." La. Civ. Code art. 748.  In *Woodward v. Gehrig*, the Louisiana Third Circuit took up the appeal of a case where the trial court had ordered the removal of all obstructions from a servitude. 97-1040 (La.App. 3 Cir. 2/11/98) 707 So.2d 1322, 1324, *writ denied*, 98-0651 (La. 4/24/98), 717 So.2d 1177.  Appellants argued that the servitude should be relocated to an equally convenient location, at their option, which the plaintiff would be bound to accept. *Id.*  The Court evaluated the appellants' claim under Louisiana Civil Code Article 748.  The Court found that "[u]nder this article, a servitude may not be repositioned by the owner of the servient estate unless there is a showing that the original location has become more burdensome for the owner or that the location prevents him from making useful improvements to his property." *Id.*  The Court continued that: "[i]f the owner of the servient estate fails to satisfy this initial burden, the option of an alternate route or location for the servitude is eliminated." *Id.*  Therefore, the Court found that an alternate location could only be appointed for the servitude if the owner of the servient estate, in this case CHS, proved that the original location had become burdensome to the servient

15

estate. *Id.* The Court found that mere inconvenience to the servient estate was not enough. *Id.*
The Court finds that CHS has the option of providing an alternate location for PH to exercise its
servitude rights because CHS has demonstrated (1) that the original location of the servitude has
become more burdensome to it because of its construction of the barge cover station, and (2) that
the original location of the servitude prevents CHS from making useful improvements to its
estate. *Id.* at 1325.

There would have been no obstruction of the servitude if CHS had put its barge cover
station ahead of its unloading facility instead of behind it.   If the Corps will not approve a dock
while the barge cover station remains, or if CHS feels that it may not make adequate use of its
barge cover station with either dock that the Corps permits PH to build, CHS has met its burden
under *Gehrig*, and it may provide PH with an equally convenient location for its dock.  Under
this arrangement, the location provided would also need to have easy access to PH's facility
(regardless of whether the facility is operated by PH or its invitee).

### C. Creation of a Holding Pond

The second issue in this case concerns PH's access to the barge dock because of CHS'
creation of a holding pond, which PH claims negatively impacts its servitude by "eliminating the
necessary ground space required to construct the delivery systems ancillary to the dock." *Id.*[11]
PH seeks "a preliminary and permanent injunction preventing further excavation for the

---

[11]The pond is already in existence on part of the servient property. Tr. I:170 (testimony of
Stewart).

retaining pond and/or works in the Servitude which will impact negatively Plaquemines

Holdings' exercise of those Servitude rights." Rec. Doc. 1 at 7.  PH's statement in its post-trial

brief that it "seeks a declaratory judgment affirming its right to construct a road on CHS Property

in order to access its dock" misstates the remedy that it has asked for in this case. Rec. Doc. 115

at 2.

PH argues that Section 7.1 of the SA gives it the right to construct a dock within the

servitude area. Rec. Doc. 115 at 21.  Section 7.1 grants PH:

> non-exclusive perpetual predial and personal servitudes of ingress to and egress
> from the [PH] Property over and upon the Company Property Incidental and
> reasonably necessary to the exercise of rights under the Servitudes, which
> Access Servitudes shall be exercised only upon the existing streets, driveways
> and other Improved passageways of the Company Property as more fully shown
> on the Servitude Survey, including without limitation, the roadway marked as the
> 'River access Road' on the Servitude Survey, and on all other streets, driveways
> and other improved passageways as and when constructed by Company or any
> future Company Property owner . . . .

Trial Exh. 1.

The Court finds that this provision does not mandate prevention or removal of the

holding pond. Furthermore, PH argues that the barge dock will require road access. Rec. Doc.

115 at 21 to 22.  The Court finds that not to be the case.

At trial, Stewart discussed the need for a road to the dock. Tr. I:236.  He explained that

there is no road from the end of the railroad tracks to the dock, creating a gap of approximately

200 feet. Tr. I:235-36.  The Court understands from Stewart's testimony that you cannot drive on

top of the Mississippi River levee. Tr. I:238.  There is an existing pipeline that stretches over the

holding pond to the area where PH's dock may be constructed in the servitude area. Tr. I: 180

(testimony of Stewart).  PH has the right to use the pipeline under Section 3.1 of the SA.[12]

Stewart acknowledges that PH wishes to use the pipeline. Tr. I: 140.  He also acknowledges that

the pond puts no limitation on the pipelines, just the road. Tr. I:141.  The Court finds the pipeline

to be an adequate means of transferring product from PH's facility to its future barge dock.

Moreover, the SA does not give PH the right to construct an additional roadway to its dock.  The

agreement specifically states that PH may use "existing streets, driveways and other Improved

passageways of the Company Property." Trial Exh. 1, § 7.1.  The Court does not find it

necessary to order a return of the servitude property to the same condition as it was before any

construction activity began.

    D. Scope of the Litigation

      CHS argues in its post-trial brief that the Court should reject PH's claims because PH has

expanded the scope of the litigation to be "markedly different from the Complaint." Rec. Doc.

116 at 11.  CHS makes these arguments about PH expanding the scope of the remedy requested

while expanding the scope of its own request.  CHS argues in its post-trial brief that PH is

---

[12]Section 3.1 of the SA provides PH: "the right to construct, operate, use, maintain, repair and replace a pipeline and relaxed loading and transfer facility and appurtenant works for the transmission of Product from the [PH] Property to the [PH] Dock for loading into barges and ships; and (iii) the right to construct, operate, use maintain, repair and replace conveyor belt systems and related loading and unloading facilities and other improvements for the transmission of Raw Material and supplies from the [PH] Dock to the [PH] Property and the transmission of Raw Material, Product, Byproduct and supplies from the [PH] Property to the PH Dock for loading into barges and ships."

expanding the scope of its declaratory judgment request by asking "the Court to resolve: (1) whether CHS breached the Servitude Agreement by constructing a barge cover station[;] (2) whether CHS breached the Servitude Agreement by failing to assist Plaquemines Holdings with its permit application; and (3) whether CHS breached the Servitude Agreement by construction of a retention pond." *Id.* at 9.  CHS objects to these questions despite the fact that they were clearly stated by PH as "Contested issues of law" in the Pretrial Order.[13]  CHS makes this claim without specifying what the Court should be deciding in determining the ambiguous "manner of exercise" of the dock servitude. *Id.*  The Court finds that, beyond PH's request to grant a declaratory judgment affirming its right to construct a road on CHS Property in order to access its dock, PH's guidance on how to decide its original claim for declaratory judgment does not expand the issues the Court was asked to decide.  Rather, the three questions set out by PH in the pretrial order help the Court focus its decision and are necessary parts of the broader question that the Court was asked to examine. Rec. Doc. 66 at 22.[14]

Moreover, CHS makes its claim about PH expanding the scope despite the fact that CHS also put forth similar questions as "Contested issues of law" in the Pretrial Order including (1) Whether the SA restricts CHS from constructing a retention pond or any other improvement on

---

[13]The Court finds that these issues include questions of fact in addition to contested questions of law.

[14]*See* the Petition for Injunction, Declaratory Judgment, and Damages asking for these remedies. Rec. Doc. 1 at 4-8.

its property; (2) Whether CHS is required to cooperate with Plaquemines Holdings when it proposes a dock that violates the servitude." *Id.*  CHS has also argued that the Court must decide additional questions about the SA in order to determine whether declaratory judgment is appropriate.  For instance, CHS asks the Court to find that construction of the barge cover station did not breach the SA in any respect. Rec. Doc. 116 at 19.  CHS also asks the Court to determine the definition of the term "invitee" in Section 1 of the SA in order to determine whether PH may validly exercise the servitude for the benefit of its lessee, Omega. Rec. Doc. 116 at 10; Trial Exh. 1, § 1.  The Court finds that PH's claims, as set out in tripartite above, were part of the necessary scope of the Court's decision to determine the "manner of exercise" of the dock servitude.

### III. CONCLUSION

IT IS ORDERED that CHS shall not object to Plaquemines Holdings, LLC's request to build a barge dock and shall either permit Plaquemines Holdings, LLC to build a barge dock in its existing servitude area, or shall provide Plaquemines Holdings, LLC with another equally convenient location for the barge dock as specified in this Order and Reasons.

IT IS FURTHER ORDERED that Plaquemines Holdings, LLC must build a dock that is in line with the existing dock and will be the least invasive to CHS' operations as specified in this Order and Reasons.

IT IS FURTHER ORDERED that Plaquemines Holdings, LLC is denied an injunction to prevent excavation of the holding pond and the current arrangement allowing for a delivery system through a pipeline over the pond to the servitude area or the location of Plaquemines

Holdings, LLC's future barge dock is to continue.

IT IS FURTHER ORDERED that judgment be entered in favor of the plaintiff, Plaquemines Holdings, LLC, and against the defendant, CHS, Inc., granting a declarative judgment as to the issue of the barge dock, and in favor of the defendant, CHS, Inc., and against Plaquemines Holdings, LLC, denying a preliminary and permanent injunction preventing the holding pond and denying a mandatory injunction requiring the return of the servitude property to the same physical state that it was in before any construction activity began.

New Orleans, LA, this 6th day of September, 2013.

HELEN G. BERRIGAN
UNITED STATES DISTRICT JUDGE