## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**PLAQUEMINES HOLDINGS, L.L.C.**        **CIVIL ACTION**

**VERSUS**        **NO. 11-3149**

**CHS, INC.**        **SECTION "C" (4)**

## <u>AMENDED OPINION</u>

This matter was tried before the Court, without a jury, on April 15, 2013 and April 16, 2013, and taken under advisement. Rec. Doc. 103.[1] The Court conducted a site visit on April 18, 2013. Rec. Doc. 104. Having considered the evidence and the testimony adduced at trial, the record, and the post-trial memoranda of counsel, and the law, the Court now issues its opinion in favor of the plaintiff, Plaquemines Holdings, LLC ("PH"), and against the defendant, CHS, Inc. ("CHS"), for the following reasons.

### I. BACKGROUND

This case involves a dispute over a Servitude Agreement ("SA"). PH seeks a declaration of rights under the SA to construct a dock on the Mississippi River. Rec. Doc. 1 at 4. PH seeks to enjoin CHS from objecting during the permitting of its proposed dock. *See* Rec. Docs. 1-1 at 8, 66 at 7. Additionally, PH seeks to stop CHS' construction of a large holding or retaining pond ("retaining pond") which will allegedly prohibit PH's use of its servitudes. *Id.* CHS' immovable

---

[1]The transcript of each day's proceedings shall be differentiated by day I and II in future citations to the date and page from each day of trial.

property, which is burdened by the servitudes in favor of PH, is in Myrtle Grove. *Id.* at 5.  At the property, CHS operates a grain elevator known as the Mississippi River Grain Elevator ("grain elevator"). *Id.*  CHS' property, in addition to the grain elevator, has a storage facility, a dock on the Mississippi River,  and appurtenant facilities including a barge cover station. *Id.*; Rec. Doc. 10 at 2; Rec. Doc. 66 at 3.

CHS is the successor-in-title to ConAgra. Rec. Doc. 66 at 4.  ConAgra granted a Predial and Personal Servitude (under the SA) to the Mississippi River Alcohol Company, Inc. ("MISSALCO"), PH's predecessor-in-title, on August 30, 1994. Rec. Doc. 1 at 5.  An instrument recorded the SA in Plaquemines Parish in COB 860, Folio 681, on May 23, 1995. *Id.*  The SA includes a "belt" servitude and a "dock and delivery system" servitude. *Id.*[2]

MISSALCO was the predecessor-in-title to Archer-Daniels-Midland Company ("ADMC"), and PH is now the successor-in-title to ADMC. *Id.* at 6.  In 2005, CHS and ADMC executed an instrument, which was recorded in Plaquemines Parish, at C.O.B. 1095, Page 138. *Id.*  It was entitled "Mutual Estoppel Certificates and Acts of Ratification" and declared the servitude at issue here to be "still in full force and effect and [to] not [have] lapsed by virtue of non-use, [or] passage of time . . . ." *Id.*

PH (the dominant-estate-holder) wishes to construct and operate a barge dock in the servitude area and to have access to the barge dock. Rec. Doc. 66 at 4.  PH has leased the facility

---

[2]A separate agreement that gives CHS rights to use PH utilities and access road and rails over the PH property is trial exhibit 14.

to Omega for operation of a waste oil reconditioning facility, and Omega requires a dock to use in conjunction with the plant. *Id.* at 3.  PH alleges that CHS has begun construction of a retaining pond on its property in an area burdened by one of the servitudes, and that the pond will adversely impact PH's servitude rights by restricting its delivery system. *Id.* at 5-6.  CHS claims that PH's barge dock will "unreasonably interfere" with CHS' grain elevator operations in violation of Section 3.2 of the SA, and therefore PH may not construct a barge dock within the servitude area. *Id.* at 6.  PH's barge dock allegedly interferes with CHS' operations because it blocks access to CHS' barge cover station. *Id.*  CHS constructed the barge cover station approximately seven years after the SA was confected. *Id.*

PH submitted an application for a permit to build the dock to the U.S. Army Corps of Engineers ("the Corps") on April 9, 2012. *Id.* at 15.  CHS submitted a written objection to PH's proposal on August 7, 2012. *Id.* at 19.  Since submitting the proposal, PH has developed two other design drawings of proposed locations for other docks within the servitude area. *Id.* at 7.

CHS claims that because PH never requested consent to use the plant for motor oil, the SA does not give PH rights to construct the dock because the SA provides only for PH to produce a grain-based product. *Id.* at 13.  Furthermore, CHS contends that the SA does not permit PH to authorize an invitee, such as Omega, to enter CHS' property to operate the facility because the SA only allows a lessee to enter CHS' property as reasonably necessary for PH to exercise its servitude rights. *Id.* at 12.

PH filed a petition for injunction, declaratory judgment and damages in the 25th Judicial

3

District Court for the Parish of Plaquemines on December 13, 2011. Rec. Doc. 1.  CHS properly

removed the case to this Court under 28 U.S.C. § 1441(a) on December 27, 2011. *Id.*  This Court

has jurisdiction pursuant to 28 U.S.C. § 1332. Rec. Doc. 7 at 2.  PH seeks a declaratory

judgment, pursuant to the SA, granting it the right to "construct, operate, use, maintain, repair,

and (if needed in the future) replace a dock and any and all other appurtenant and related

structures (the river and land side of the Mississippi River levee) in the servitude area in line

with the existing dock facility operated by CHS, Inc. according to the surveys attached to the

original Servitude Agreement." Rec. Doc. 1 at 7.  The Court has exercised its discretion to hear

this declaratory judgment action. Rec. Doc. 7 at 8.  PH also seeks an "injunction requiring the

return of the Servitude property to the same physical state that it was in <u>before</u> any construction

activity began." *Id.*

## II. THE SERVITUDE AGREEMENT

The Court heard testimony from eleven witnesses including (1) Janet Cagley (the

financial executive for Henderson Auction JAH Enterprises, Inc.) for PH, (2) James Cook

(former general manager of CHS' grain elevator) called by PH on cross examination, (3) Chad

Poche (civil engineer and vice president of Gulf South Engineering and Testing, Inc.) for PH, (4)

William Hurst (Mr. Stewart's previous business partner) for PH, (5) Kenneth Stewart (a partner

in PH), (6) Gary Anderson (CHS' company representative), (7) Timothy Paurus (Vice President

of Terminal Operations for the grain marketing business unit at CHS) called by PH, (8) Steven

Talbot (general manger of CHS' Myrtle Grove Terminal) for CHS, (9) Wayne Wilson (certified

4

as an expert river pilot) for CHS, (10) Kenneth Nelson (a certified expert in professional

engineering) for CHS, and (11) J. Stephen Lucas (an expert in grain trading operations and

elevator supply chain management) for CHS.

      A. CHS' Claims for Invalidity of the SA

      As a preliminary matter, the Court addresses CHS' claims at trial and in its post-trial

brief that PH may not construct a dock for use by a lessee, Omega, or for use with a facility that

is reconditioning motor oil. Rec. Doc. 116 at 12.  CHS argues that the SA expressly forbids the

use of the servitude by Omega. *Id.*  Section 15.1 of the SA states: "PH shall not authorize any

invitee or other person to enter the Company Property except as reasonably necessary for [PH] to

exercise its servitude rights for its legitimate needs in operating the Plant." Trial Exh. 1.  An

invitee is defined as including "any lessee or sublessee of any portion of [PH] Property or the

buildings thereon . . . ." *Id.* § 1.  Section 15.1 also recites that the grant of servitude rights to PH

"shall also include the use of such servitude rights by Invitees of [PH]."  Omega, as PH's lessee,

is PH's invitee. Tr. I:244 (testimony of Stewart). While the Section caveats the use of PH's

rights by an invitee with the fact that invitees are only allowed to use the servitude rights "to the

extent reasonable and necessary to perform the services for [PH] for which they were authorized

to enter the Company Property," this statement appears to indicate only that invitees may not

freely trespass on CHS' property. Trial Exh. 1, § 15.1.  It does not expressly forbid the use of the

servitude rights by the invitee.  It actually does the opposite.  The Section acknowledges that

invitees may use the servitude rights. *Id.*

CHS also makes the claim that even if PH may construct the dock for its invitee, Omega, it may not construct the dock because Omega's proposed operation violates the SA by processing used motor oil. Rec. Doc. 116 at 13.  CHS relies heavily on the idea that the SA was formed to further the relationship between CHS and PH's predecessors.   Cook, the general manager of CHS' grain elevator, testified credibly about this relationship. Tr. I:83.  CHS argued that the parties to the SA: "envisioned the production of grain-based ethanol on the dominant estate through the purchase and use of the grain that was already passing through servient estate's grain distribution operation." Rec. Doc. 116 at13.  Despite what the original signatories may have envisioned, there is no "synergy" between CHS and PH's operations.  Nor has there been over the last nearly twenty years while the SA has been in force.  The parties have not shown that they are considering working together on the production of any product by relying on the other's product for raw material.  To forbid PH from using the servitude for the production or transport of another product, when there is no foreseeable agreement with CHS to use its grain for grain-based ethanol, would unreasonably restrict the use *of PH's* immovable property. Louisiana law favors the free use of immovable property. *Leonard v. Lavigne*, 245 La. 1004, 162 So.2d 341, 343 (La. 1964)*; Textron Financial Corp. v. Retif Oil & Fuel LLC*, 342 Fed. App'x 29, 34 (5th Cir. 2009) (citing *Leonard*, 245 La. 1004 at 343).

The SA allows PH to produce alternative products including refined motor oil.  The SA itself defines the product which may be produced by PH to be "all ethanol produced by the ethanol production facility on the [PH] property, *as well as all other products manufactured,*

*distilled, refined or otherwise produced through operation of the Business on the [PH]*

*Property*" (emphasis added). Trial Exh. 1, § 1.  However, the SA includes in the definition of the

term "Business" that PH's business may include that of "other processed chemicals," but

approval is required. *Id.*  Building on this, buried in the definition of "Business" is the

requirement that PH may not use the servitude to undertake unrelated business activities, not

related to grain processing, "without the prior written consent of Company, which consent shall

not be withheld unless such unrelated use unreasonably interferes with Company's business

activities and operations of the Elevator." *Id.*  To determine whether Omega may, with written

consent of the company, work with motor oil, the Court looks at whether use of that product

would unreasonably interfere with CHS' business activities.

Omega's use of the servitude to ship refined motor oil does not unreasonably interfere

with CHS' business.  CHS' only argument for why Omega's use of the dock unreasonably

interferes with its business appears to be a red herring. Rec. Doc. 115 at 20.  The argument is

that Omega's use of the dock to ship refined motor oil interferes with CHS' business because it is

unsafe to ship motor oil near grain. Rec. Doc. 116 at 15.[3]  Cook made clear to the Court in his

testimony that CHS'  issue is with the position of the dock, and the extent that any dock impacts

barge access to the barge cover station, not whether there is motor oil versus ethanol going

through the pipeline to whichever dock is built. Tr. I:96-97.  Cook stated that ethanol is

---

[3]At trial, even CHS' representative, Anderson, took no position on whether motor oil was
more hazardous than ethanol, deferring to the SA. Tr. I: 252.

7

extremely explosive, just as grain dust is. Tr. I: 97.[4]

CHS insinuates in its post-trial brief that a safety concern results from Omega transporting motor oil rather than ethanol from the dock. Rec. Doc. 116 at 13.  The SA requires CHS to give written consent to the use of any "hazardous substance." Trial Exh. 1, § 15.4.  Out of an abundance of caution, CHS must provide written consent that Omega may use PH's dock for motor oil.  The Court finds that CHS may not withhold its consent to use of the dock or facility for motor oil because, in consideration of the original agreement to use the servitude for a substance as potentially hazardous as ethanol, withholding of consent to use the servitude for motor oil would be unreasonable.

### B. Placement of the Dock under the Servitude Agreement

As CHS has argued, a predial servitude is in derogation of public policy, and therefore must never be sustained by implication. *Palomeque v. Prudhomme*, 95-0725 (La. 11/27/95), 664 So.2d 88, 93 (La. 1995).  Any "[d]oubt as to the existence, extent, or manner of exercise of a predial servitude shall be resolved in favor of the servient estate." La. Civ. Code art. 730.  Here, there is no doubt. *See* Rec. Doc. 66 at 17 (stating as uncontested material fact that CHS' predecessor-in-title granted a servitude in favor of PH's predecessor on August 30, 1994, which burdened CHS' immovable property "on the 'land' side of the Mississippi River levee as well as

---

[4]Stewart stated on cross-examination that motor oil had a lower flash point than ethanol. Tr. I:190.  Stewart is not an expert in this area, and the Court declines to take judicial notice of the flash point of either substance because no evidence has been supplied to it based on the chemical compounds at issue here, and the flash point of motor oil may be manipulated.

extending out into the Mississippi River in line with a dock" and that the servitude is currently in effect between the parties).

Since a written agreement or contract governing the servitudes at issue in this case exists, the servitudes are regulated by the agreement, and the Court looks to the SA for guidance. La. Civ. Code art. 1983 (contracts have the effect of law for the parties and must be performed in good faith); *Terrebonne Parish School Board v. Columbia Gulf Transmission Co.*, 290 F.3d 303, 315 (5th Cir. 2002) (finding that the Louisiana suppletive law of property applies if the parties do not specify the use and extent of the servitude); *St. Martin v. Mobil Exploration & Producing U.S. Inc.*, 224 F.3d 402, 409 (5th Cir. 2000) (citing *Ogden v. Bankston*, 398 So.2d 1037, 1040 (La. 1981)) (explaining that when a servitude is created by contract, the mode of use of the servitude is regulated by that contract). The Court reads the SA for the plain meaning of its terms under Louisiana Law. *St. Martin*, 224 F.3d at 409 (citing *Massie v. Inexco Oil Co.*, 798 F.2d 777, 779 (5th Cir. 1986)). The SA covers the main issue here, which is whether PH can construct a barge dock in the servitude area, and the manner of exercise of PH's right to this.

The SA grants PH the right to "construct, operate, use, maintain, repair, and replace the [PH] dock." Trial Exh. 1, § 3.1. The SA stipulates that the dock "may only be located within the area indicated as the Grantee Dock Servitude Area on the Servitude Survey, in line with the existing Company dock, in such a specific location as shall not unreasonably interfere with barge and ship traffic for the Elevator." Trial Exh. 1, § 3.2; *See* Trial Exh. 2 for servitude area.

CHS argues that if PH places one of its proposed barge docks in the servitude area, it will

unreasonably interfere with barge traffic to the Elevator, and therefore "Plaquemines Holdings

may not construct its barge dock anywhere within the Servitude area." Rec. Doc. 66 at 6.

However, CHS specifically states in its post-trial memorandum that it does not take the position

that any dock placement is impossible, only that PH's currently proposed dock violates the SA.

Rec. Doc. 116 at 3.

### i. Breach of the Servitude Agreement

CHS' construction of its barge cover station did not breach the SA.  The SA permits CHS

to develop its property, "so long as such development does not physically damage any Servitude

Works owned by [PH] or its invitees, and does not unreasonably limit or otherwise adversely

affect any existing or future exercise of rights under the Servitudes, or the use, maintenance,

repair, replacement or operation of the Servitude Works facilitating the use of the Servitudes."

Trial Exh. 1, § 9.  At the time CHS constructed the barge cover station in 1998, there was no

dock in the servitude area.[5] Rec. Doc. 78 at 6.  But, the SA specifically states in plain language

that CHS' development, including "present and *future* improvements" (emphasis added) may not

adversely affect any "existing or *future* exercise of rights under the Servitudes" (emphasis

added). *Id.*  Section 9 of the SA references the future twice to specify that it applies to both

---

[5]Uncertainty has been presented as to whether the barge cover station was constructed in 1998 or 2000, but the difference is immaterial. *Compare* defendant CHS' Post-Trial Memorandum in Rec. Doc. 116 at 4 (referring to the barge cover station as constructed in the year 2000), *with* CHS' Proposed Findings of Fact and Conclusions of Law in Rec. Doc. 78 (referring to the barge cover station as built in 1998).

improvements in the future and PH's servitude rights in the future.  The barge cover station was a future improvement at the time the SA was granted.[6]  While the Court finds that CHS did not breach the SA by constructing the barge cover station, the barge cover station may not unreasonably limit or adversely affect the future exercise of PH's rights under the servitude in the form of PH's desire to build a barge dock.

The 2005 Mutual Estoppel Certificates and Acts of Ratification ("the Certificate") did not acknowledge that there had been no breaches to the SA or waive any claim with regard to the barge cover station as CHS has argued. Rec. Doc. 116 at 20.  A plain reading of the document provides that PH's predecessor-in-title, ADMC, never stipulated that CHS could not be in default. Trial Exh. 37.  Rather, the parties declared that CHS was not currently in default and declared that there was no pending litigation that would affect the enforceability of the servitude. *Id.* at 2.  Hurst stated at trial that he had the easements recertified as part of his due diligence before PH purchased the facility. Tr. I:155.  The Court finds to be credible Hurst's testimony that the reason the Certificate was prepared was to assess the rights that would accompany the

_____

[6]Section 10.7 of the SA further confirmed that CHS had the right to construct or install "buildings, storage facilities or other improvements or equipment" in areas burdened by the servitudes. However, it also stipulates that CHS may do this "provided that doing so does not prevent reasonably convenient access to, and construction, installation, use, operation, maintenance, repair and replacement of, Servitude Works by [PH] to the extent provided in this agreement" (emphasis supplied).  Despite CHS' attempt to use this Section to argue that a barge cover station outside the servitude area does not infringe on PH's rights, the Section is not relevant because it does not say anything about improvements outside of the servitudes area, and the barge cover station is an improvement outside of the servitude area. Rec. Doc. 116 at 19.

acquisition of the PH property, and finds that the purpose of the Certificate was to make clear

that the SA was still in effect. Tr. I:166.  The Certificate states that the SA "is still in full force

and effect and has not lapsed by virtue of non-use, [or] passage of time . . . ." Trial Exh. 37 at 2.

The Certificate did not waive the parties' right to dispute any breaches that occurred as a result of

development undertaken between the time the servitudes were granted in 1994 and the time the

Certificate was executed in 2005.  The Certificate made no mention of development or

improvements between that period, or anything that would change the SA from how it was

drafted in 1994.

#### ii. Selection of a Dock

The servitude area is located 409 feet from CHS' barge cover station. Tr. I:117-18

(testimony of Poche).  PH proposed one dock when it applied for a permit from the Corps. *See*

Trial Exh. 5 for the permit application.  That permit was rejected. Tr. I:101 (testimony of Poche).

PH has now proposed two other docks. Trial Exh. 4. The placement of the dock under Option 1

is of questionable feasibility because it would require dredging or removing some of the bank,

which would require the permission of the Corps. Trial Exhs. 4-A, 4-B; Tr. I:115-16 (testimony

of Poche).  It would also require breaking up the concrete in the revetment. Tr. I:135 (testimony

of Poche).  Option 2 is the dock that appears in trial exhibits 4-C and 4-D.  Poche explained at

trial that with this design, CHS would  be able to fit a barge into the first slot, but would not be

able to access the second bay or second lane of the port side of its facility when PH had a barge

at its dock. Tr. I:114-15.[7]  CHS will be able to access both bays or lanes of the barge cover

station when PH has no barge at its dock. Tr. II: 105-06 (testimony of Wilson). PH has not asked

CHS to approve PH's design drawings of the docks. Tr. I:125 (testimony of Poche).

After the SA grants PH the right to construct and operate a dock, the SA sets out certain

requirements for the location.  In addition to the requirements of being located within the

servitude area, being in line with the existing dock, and not unreasonably interfering with traffic

to the elevator, the SA requires that the dock not occupy any more of the servitude area than is

reasonably necessary to accommodate an appropriately sized dock, and that the requirements are

"as approved pursuant to Section 10.3, below." Trial Exh. 1, § 3.2.  Section 10.3 requires that PH

not undertake any construction or materially different or new usage of CHS property without its

"plans and specifications in reasonable detail hav[ing] been submitted to and approved by

Company, which approval shall not be unreasonably withheld or delayed. . . ." Section 10.2 of

the SA requires CHS to "use reasonable efforts to assist [PH], at [PH's] expense, to obtain any

necessary licenses, permits or other approvals from any governmental Authority. . . ."

The Court finds that PH has a right to build a barge dock in the servitude area.  While PH

has the right to build the dock, PH must build one that is in line with the existing CHS dock.

Therefore, before proceeding with either Option 1 or Option 2, PH must modify them to ensure

_____

[7]Before building the barge cover station, CHS operated with one lane of barges and put
the hatch covers back on each barge upriver with a different crane and crew than took it off. Tr.
I: 267 (testimony of Paurus).  CHS could similarly now bring a barge that had been unloaded
back around to the first lane to put the hatch covers back on. *Id.*

that the outer, river-side (or outboard as opposed to land-facing) edge of the proposed dock follows the same line as the outer, river-side edge of the existing CHS dock.

PH's right to build a dock is subject to the requirement that the dock not unreasonably interfere with CHS' operations. However, PH is under no obligation under the SA to adopt a plan that does not interfere with CHS' use of its barge cover station because the barge cover station was not present when the SA was granted. Nor is there any evidence that the area where the barge cover station is located was in use before the barge cover station was built. *See* Tr. I:34, 35-37 ("[t]here was nothing . . . within the footprint of the barge cover station before the barge cover station was built."). The potential for a dock proposed by PH to interfere with CHS' barge cover station operations does not constitute reasonable grounds for CHS to withhold or delay its approval under the SA.

PH's right to build a dock is also subject to the requirement that it submit any appropriately modified dock construction plans and specifications to CHS in reasonable detail and obtain CHS' approval, before beginning construction. Reasonable detail necessarily entails an estimate of the amount of the servitude area that will be available to CHS for navigation purposes after PH's dock has been constructed. Once reasonable detail has been provided, CHS may not unreasonably withhold or delay its approval.

This Opinion will not relieve the parties of the duty to obtain approval for construction from the Corps, or any other responsibility under law. Section 10.2 of the SA does not permit CHS to object to permitting by the Corps or any other government body based on a proposed

14

dock's interference with the operation of its barge cover station. Although the SA does not require PH to obtain CHS' approval for a dock design before approaching the Corps for permitting, CHS' objection to PH's proposal to the Corps will not violate the SA where it is based on PH's failure to provide reasonable detail regarding the dock design.

CHS' objection to the permit application that PH submitted to the Corps (the "Wright Drawing") did not violate the SA because the proposed dock was not fully in line with CHS' existing dock and PH had not provided CHS with reasonable detail regarding the design for its approval. For these reasons, the Court cannot enjoin CHS to withdraw its objection to the "Wright Drawing." Further, PH has not yet provided CHS with reasonable detail regarding a dock design that complies with the SA in all relevant respects. Therefore, the Court cannot enjoin CHS to refrain from objecting to any future permit applications to the Corps or any other permitting body.

The Court also finds, based on the evidence presented at trial, that CHS has the right to modify, relax, or alter any of the requirements dictating the location for the exercise of the servitude agreement, including the requirement that a dock be placed in line with the existing dock on CHS' land.

The Louisiana Civil Code provides that if the original location of a servitude "has become more burdensome for the owner of the servient estate, or if it prevents him from making useful improvements on his estate, he may provide another equally convenient location for the exercise of the servitude which the owner of the dominant estate is bound to accept." La. Civ.

15

Code art. 748.  In *Woodward v. Gehrig*, the Louisiana Third Circuit took up the appeal of a case where the trial court had ordered the removal of all obstructions from a servitude. 97-1040 (La.App. 3 Cir. 2/11/98) 707 So.2d 1322, 1324, *writ denied*, 98-0651 (La. 4/24/98), 717 So.2d 1177.  Appellants argued that the servitude should be relocated to an equally convenient location, at their option, which the plaintiff would be bound to accept. *Id.*  The court evaluated the appellants' claim under Louisiana Civil Code Article 748.  The court found that "[u]nder this article, a servitude may not be repositioned by the owner of the servient estate unless there is a showing that the original location has become more burdensome for the owner or that the location prevents him from making useful improvements to his property." *Id.*  The court continued that: "[i]f the owner of the servient estate fails to satisfy this initial burden, the option of an alternate route or location for the servitude is eliminated." *Id.*  Therefore, the court found that an alternate location could only be appointed for the servitude if the owner of the servient estate, in this case CHS, proved that the original location had become burdensome to the servient estate. *Id.*  The court found that mere inconvenience to the servient estate was not enough. *Id.*

CHS has demonstrated (1) that the original location of the servitude has become more burdensome to it because of its construction of the barge cover station, and (2) that the original location of the servitude prevents CHS from making useful improvements to its estate. *Id.* at 1325.  Therefore, CHS has met its burden under *Gehrig*, and it may provide PH with an equally convenient location for its dock.  Under this arrangement, the location provided would also need to have easy access to PH's facility (regardless of whether the facility is operated by PH or its

16

invitee).

    <u>C. Creation of a Holding Pond</u>

    The second issue in this case concerns PH's access to the barge dock because of CHS'

creation of a holding pond, which PH claims negatively impacts its servitude by "eliminating the

necessary ground space required to construct the delivery systems ancillary to the dock." *Id.*[8]  PH

seeks "a preliminary and permanent injunction preventing further excavation for the retaining

pond and/or works in the Servitude which will impact negatively Plaquemines Holdings'

exercise of those Servitude rights." Rec. Doc. 1 at 7.  PH's statement in its post-trial brief that it

"seeks a declaratory judgment affirming its right to construct a road on CHS Property in order to

access its dock" misstates the remedy that it has asked for in this case. Rec. Doc. 115 at 2.

    PH argues that Section 7.1 of the SA gives it the right to construct a dock within the

servitude area. Rec. Doc. 115 at 21.  Section 7.1 grants PH:

> non-exclusive perpetual predial and personal servitudes of ingress to and egress
> from the [PH] Property over and upon the Company Property Incidental and
> reasonably necessary to the exercise of rights under the Servitudes, which
> Access Servitudes shall be exercised only upon the existing streets, driveways
> and other Improved passageways of the Company Property as more fully shown
> on the Servitude Survey, including without limitation, the roadway marked as the
> 'River access Road' on the Servitude Survey, and on all other streets, driveways
> and other improved passageways as and when constructed by Company or any
> future Company Property owner . . . .

Trial Exh. 1.

---

    [8]The pond is already in existence on part of the servient property. Tr. I:170 (testimony of
Stewart).

The Court finds that this provision does not mandate prevention or removal of the holding pond. Furthermore, PH argues that the barge dock will require road access. Rec. Doc. 115 at 21 to 22.  The Court finds that not to be the case.

At trial, Stewart discussed the need for a road to the dock. Tr. I:236.  He explained that there is no road from the end of the railroad tracks to the dock, creating a gap of approximately 200 feet. Tr. I:235-36.  The Court understands from Stewart's testimony that you cannot drive on top of the Mississippi River levee. Tr. I:238.  There is an existing pipeline that stretches over the holding pond to the area where PH's dock may be constructed in the servitude area. Tr. I: 180 (testimony of Stewart).  PH has the right to use the pipeline under Section 3.1 of the SA.[9] Stewart acknowledges that PH wishes to use the pipeline. Tr. I: 140.  He also acknowledges that the pond puts no limitation on the pipelines, just the road. Tr. I:141.  The Court finds the pipeline to be an adequate means of transferring product from PH's facility to its future barge dock. Moreover, the SA does not give PH the right to construct an additional roadway to its dock.  The agreement specifically states that PH may use "existing streets, driveways and other Improved passageways of the Company Property." Trial Exh. 1, § 7.1.  The Court does not find it

---

[9]Section 3.1 of the SA provides PH: "the right to construct, operate, use, maintain, repair and replace a pipeline and relaxed loading and transfer facility and appurtenant works for the transmission of Product from the [PH] Property to the [PH] Dock for loading into barges and ships; and (iii) the right to construct, operate, use maintain, repair and replace conveyor belt systems and related loading and unloading facilities and other improvements for the transmission of Raw Material and supplies from the [PH] Dock to the [PH] Property and the transmission of Raw Material, Product, Byproduct and supplies from the [PH] Property to the PH Dock for loading into barges and ships."

necessary to order a return of the servitude property to the same condition as it was before any construction activity began.

### D. Scope of the Litigation

CHS argues in its post-trial brief that the Court should reject PH's claims because PH has expanded the scope of the litigation to be "markedly different from the Complaint." Rec. Doc. 116 at 11.  CHS makes these arguments about PH expanding the scope of the remedy requested while expanding the scope of its own request.  CHS argues in its post-trial brief that PH is expanding the scope of its declaratory judgment request by asking "the Court to resolve: (1) whether CHS breached the Servitude Agreement by constructing a barge cover station[;] (2) whether CHS breached the Servitude Agreement by failing to assist Plaquemines Holdings with its permit application; and (3) whether CHS breached the Servitude Agreement by construction of a retention pond." *Id.* at 9.  CHS objects to these questions despite the fact that they were clearly stated by PH as "Contested issues of law" in the Pretrial Order.[10]  CHS makes this claim without specifying what the Court should be deciding in determining the ambiguous "manner of exercise" of the dock servitude. *Id.*  The Court finds that, beyond PH's request to grant a declaratory judgment affirming its right to construct a road on CHS Property in order to access its dock, PH's guidance on how to decide its original claim for declaratory judgment does not expand the issues the Court was asked to decide.  Rather, the three questions set out by PH in the

---

[10]The Court finds that these issues include questions of fact in addition to contested questions of law.

pretrial order help the Court focus its decision and are necessary parts of the broader question

that the Court was asked to examine. Rec. Doc. 66 at 22.[11]

Moreover, CHS makes its claim about PH expanding the scope despite the fact that CHS

also put forth similar questions as "Contested issues of law" in the Pretrial Order including "(1)

Whether the SA restricts CHS from constructing a retention pond or any other improvement on

its property; (2) Whether CHS is required to cooperate with Plaquemines Holdings when it

proposes a dock that violates the servitude." *Id.*  CHS has also argued that the Court must decide

additional questions about the SA in order to determine whether declaratory judgment is

appropriate.  For instance, CHS asks the Court to find that construction of the barge cover station

did not breach the SA in any respect. Rec. Doc. 116 at 19.  CHS also asks the Court to determine

the definition of the term "invitee" in Section 1 of the SA in order to determine whether PH may

validly exercise the servitude for the benefit of its lessee, Omega. Rec. Doc. 116 at 10; Trial Exh.

1, § 1.  The Court finds that PH's claims, as set out in tripartite above, were part of the

necessary scope of the Court's decision to determine the "manner of exercise" of the dock

servitude.

### III. CONCLUSION

IT IS ORDERED that the following rights, responsibilities, and obligations of

Plaquemines Holdings, LLC and CHS under the Servitude Agreement, which was entered into

---

[11]*See* the Petition for Injunction, Declaratory Judgment, and Damages asking for these remedies. Rec. Doc. 1 at 4-8.

by their predecessors-in-title, Mississippi River Alcohol Company, Inc. and Conagra, Inc., respectively, and recorded in the Parish of Plaquemines, C.O.B. 860, folio 681, on May 23, 1995, are hereby CONFIRMED:

1.      Plaquemines Holdings, LLC has the right build a dock located within the Grantee Dock Servitude Area that is in line with CHS' existing dock, does not unreasonably interfere with traffic to CHS' grain elevator, and does not occupy more of the servitude area than is reasonably necessary to accommodate and maintain an appropriately sized dock.

2.      "In line" as used in the Servitude Agreement means that the outboard, river-side edge of the proposed dock follows the same line as the outboard, river-side edge of the existing CHS dock.

3.      Plaquemines Holdings, LLC has no obligation to propose or construct a dock according to a plan that will not interfere with CHS' use of its barge cover station. A dock proposed by Plaquemines Holdings, LLC will not unreasonably interfere with barge and ship traffic to CHS' elevator, by sole reason of its interference with CHS' use of its barge cover station.

4.      Plaquemines Holdings, LLC is obligated to submit any dock construction plans and specifications to CHS in reasonable detail and obtain CHS' approval before beginning construction on a barge dock. Reasonable detail necessarily entails an estimate of the amount of the servitude area that will be available to CHS for navigation purposes after Plaquemines Holdings, LLC 's dock has been constructed.

5.    Once reasonable detail has been provided, CHS is obligated to refrain from unreasonably withholding or delaying its approval. The potential for a dock proposed by Plaquemines Holdings, LLC to interfere with CHS' barge cover station operations shall constitute unreasonable grounds for CHS to withhold or delay its approval of a proposal.

6.    In constructing a dock in the Grantee Dock Servitude Area, Plaquemines Holdings, LLC is not relieved of the responsibility to obtain approval for construction from the U.S. Army Corps of Engineers, or any other responsibility under law. Plaquemines Holdings, LLC may approach the U.S. Army Corps of Engineers, or any other permitting body, for its approval at any time in relation to submitting plans to CHS or obtaining CHS' approval.

7.    CHS is obligated to use reasonable efforts to assist Plaquemines Holdings, LLC during the acquisition of relevant permits. CHS' objection to Plaquemines Holdings, LLC's proposal to the Corps will not violate this obligation where it is based on Plaquemine's Holdings, LLC's failure to provide reasonable detail regarding the dock design. CHS is obligated to refrain from raising objections during the permitting process that are based solely on a proposed dock's interference with the operation of its barge cover station.

8.    CHS has the right to modify, relax, or alter any of the requirements dictating the location for the exercise of the servitude agreement, including the requirement that a dock be placed in line with CHS' existing dock.

9.    Plaquemines Holdings, LLC has the right to produce and ship non-ethanol products,

including refined motor oil, on the dominant estate, using a barge dock constructed in the Grantee Dock Servitude Area.

10.     Plaquemines Holdings, LLC has the right to permit its lessee, Omega to use and access any dock constructed pursuant to the Servitude Agreement.

IT IS FURTHER ORDERED that Plaquemines Holdings, LLC is DENIED an injunction to prevent excavation of the holding pond and the current arrangement allowing for a delivery system through a pipeline over the pond to the servitude area or the location of Plaquemines Holdings, LLC's future barge dock is to continue.

IT IS FURTHER ORDERED that Plaquemines Holdings, LLC is DENIED an injunction to prevent CHS from interfering with or objecting to construction of a dock in any location or to cooperate and assist Plaquemines Holdings in application for a dock building permit from the U.S. Army Corps of Engineers.

IT IS FURTHER ORDERED THAT judgment is to be entered in favor of the plaintiff, Plaquemines Holdings, LLC, and against the defendant, CHS, Inc., granting a declaratory judgment of the parties' rights, responsibilities, and obligations under the Servitude Agreement as set forth above; and in favor of the defendant, CHS, and against Plaquemines Holdings, LLC, denying the preliminary and permanent injunctions sought.

New Orleans, LA, this 5th day of December, 2013.

HELEN G. BERRIGAN
UNITED STATES DISTRICT JUDGE